No. 31,648

Byron Borman, Administrator of the Estate of Ella Powers, Deceased, *Appellee*, v. The State Highway Commission of the State of Kansas, *Appellant*.

(32 P. 2d 457.)

Opinion filed May 5, 1934.

*Wint Smith, Edward F. Arn,* both of Topeka, *James V. Humphrey* and *Arthur S. Humphrey,* both of Junction City, for the appellant.

*John J. McCurdy,* of Lincoln, *C. W. Burch, B. I. Litowich, LaRue Royce, L. E. Clevenger* and *E. S. Hampton,* all of Salina, for the appellee.

The opinion of the court was delivered by

Harvey, J.: This is an action for damages for the wrongful death of Ella Powers, alleged to have been caused by the defective railing of a bridge on a state highway. The answer, among other things, alleged contributing negligence of the decedent. The jury returned a general verdict for plaintiff and answered special questions. Defendant moved for judgment in its favor on the answers to the special questions and the undisputed evidence, notwithstanding the general verdict. Plaintiff moved to set aside the answers to certain special questions as not being within the issues, and that some of them were not supported by the evidence. The trial court sustained plaintiff's motion, overruled defendant's motion, and rendered judgment for plaintiff on the general verdict. Defendant has appealed.

A general statement of the facts may be made as follows: State highway No. 14 from Lincoln south to Ellsworth crosses Spring creek several miles south of Lincoln over a stone arch bridge built about 1907. The span of the arch is twenty feet. The bridge is sixteen feet wide, and along each side of the top is a low stone coping, or wall, about nine inches high, on the inside of which cedar posts, about four inches in diameter, had been set in the dirt which covered the

stone of the bridge, and planks had been nailed on the posts to form a railing. These planks were of oak, originally three inches thick, and had been used as flooring on some other bridge where use had worn them to a thickness of an inch and a half to two inches in places and where they had rotted somewhat at the nail holes, or near the ends, but were otherwise sound. As placed on the posts the ends lapped one upon another at some places. The roadway across the bridge was of dirt, shallower near the center over the arch than toward the ends of the bridge. The highway patrolman grading the road graded across this bridge twice a week, using a four-horse-drawn road grader, and had so graded it the day of the casualty. The surface of the roadway was smooth and was wide enough between the railings that a farmer moving farm machinery pulled a twelve-foot hayrake behind his truck across it, but there was not much clearance on each side and he had to use care. Approaching the bridge from the south there was a curve in the road to the left and then onto the bridge. The road was properly marked with the state highway signs, "slow," "winding road," "narrow bridge." From the turn, about fifteen feet south of bridge, the road was straight onto and across the bridge.

Ella Powers, a widow, with her six children, ranging from about eight to twenty years of age, resided upon and operated a farm south of Lincoln, but north of Spring creek. On the day of the casualty, June 20, 1931, she took her two children, Mabel, about eleven, and Ethel, thirteen years, three months and twelve days of age, in her car and drove to Ellsworth. The car was a 1926 Model T Ford touring car. The gas feed was controlled by a lever on the steering wheel, which should be pulled down to increase the gas consumption of the engine and the power and speed of the car, or pulled up to shut the gas off, decreasing the power or speed. The hand brake, sometimes spoken of as the emergency brake, was operated by a lever at the left side of the car, left of the end of the front seat, where one sitting in the driver's position behind the wheel could readily reach it with the left hand, but it could not be easily reached and operated by one sitting in any other position in the car. The position of the lever was forward when the car was being operated normally in high gear on the road. By pulling this lever back the high-gear clutch was disengaged and the brakes applied. Near the floor of the car, to the left of the center and in front of a driver seated behind the steering wheel of the car, were three foot pedals

used in operating the car. The left one of these operated the clutch. The car had two forward gears, low and high. A spring held this pedal up engaging the high-gear clutch, unless the pedal were pushed down by the foot, or released by the emergency brake. If the pedal were pushed half way down with the foot it disengaged the clutch, and the car was then in neutral, and if it were pushed all the way down it engaged the low-gear clutch. There was no way to fasten the pedal in position to hold it either in low gear or in neutral. Those positions of the clutch were controlled by the driver's foot pressure, or lack of it. The center pedal was for the operation of the car in reverse gear by pushing it down and holding it down with the foot. To keep the reverse gear and the high or low gear from being in operation at the same time it was necessary to hold the left pedal at a central position with the foot so that neither of the forward gears would be connected, or to pull back the emergency brake lever enough to throw those gears into neutral, but not enough to engage the emergency brake. The pedal nearest the center of the car and to the right of the one sitting in the driver's position was for a brake which could be applied by pressing that pedal down with the foot. This could be done while the car was in gear, but would be more effective if it were in neutral. These devices for operating the car were so placed as to be within reach and readily accessible to one seated directly behind the steering wheel, which was the normal position of the driver or operator of the automobile. Some of these could be reached and operated by one seated in the front seat to the right of the driver, but it was difficult, if not impossible, to operate the emergency brake lever or the clutch pedal from that position.

On the day of the casualty, having completed their errands at Ellsworth, Ella Powers, with her children, started home about five o'clock in the afternoon. She drove until they got out of town, then she stopped the car, had Ethel get in the driver's seat to drive, and she took her seat in the middle of the front seat of the car, with Mabel to her right. The mother and an older sister previously had given Ethel some instruction about driving a car, but she had never driven alone. In this position Ethel drove the car until they approached the bridge above described. When they came to the "Slow" sign Mrs. Powers pushed the gas lever up and told Ethel she should always do that and let the car slow its speed at a "Slow" sign. Mrs. Powers then put her left arm on the back of the seat

behind Ethel and took hold of the steering wheel with her right hand. Ethel continued with her hands on the steering wheel. In this position they continued, Mrs. Powers assisting Ethel in steering and driving the car around the curve and on the approach to the bridge, traveling at a speed of perhaps twelve to fifteen miles per hour. They negotiated these curves without difficulty and had driven onto the bridge. When about the center of the bridge itself, directly over the center of the arch, or a little past it, the left front fender or wheel caught on a post or a plank of the railing on the left side of the bridge. Mrs. Powers exclaimed: "Oh, Ethel." The car pulled sharply to the left, pushed the railing over, knocked one of the stones from the coping, or wall, at the top of the bridge, and fell about fifteen feet to the bed of the creek, which contained no water at that time. Mrs. Powers was killed by this fall; perhaps her neck was broken. Ethel had an arm broken and her mouth severely cut and bruised. Mabel was practically uninjured. She ran to a house near by, where help was obtained.

The special questions and answers returned thereto by the jury are as follows:

. "1. For how long a time before the accident had the bridge where the accident took place and the approaches thereto been in substantially the same condition as they were at the time of the accident? A. About two years.

"2. By the exercise of careful attention and skillful and competent driving, could a car be driven safely over the bridge on the day of the accident? A. Yes.

"3. Had Ella Powers driven over the bridge and road in question many times prior to the accident? A. Yes.

"4. Considering the approaches to and the width of the bridge, was the obvious situation such as to require especially careful, skillful and competent driving on the part of a person about to drive a car across the bridge? A. Yes.

"5. Was the accident caused by the car colliding or coming in contact with the railing of the bridge on the driver's left-hand side? A. Yes.

"6. What was the width of the traveled road at the point of the accident? A. About twelve feet.

"7. On the arrival at or near to the approach to the bridge, was Ethel Marie Powers, with the consent of Ella Powers, driving the car? A. No.

"8. Was Ethel Marie Powers under the age of 14 years at the time of the accident? A. Yes.

"9. Was Ethel Marie Powers driving the car at the point of the accident? A. No.

"If you answer question No. 9 'no,' then answer questions No. 10 to No. 15, inclusive.

"10. Did Ethel Marie Powers remain in the driver's seat and behind the wheel until the occurrence of the accident? A. Yes.

"11. Did Ella Powers drive the car from the middle of the front seat and at the right side of Ethel Marie Powers and with only one hand on the wheel? A. Yes.

"12. Could Ella Powers, from where she sat, quickly and efficiently control the emergency brake and the clutch? A. No.

"13. Could Ella Powers from where she sat and with only one hand on the wheel drive the car over a road difficult for driving because of its sharp curves and narrowness with as much accuracy and safety as she could have done from the driver's seat behind the wheel and with both hands on the wheel? A. No.

"14. Was the accident probably caused by a failure to drive the car accurately along the roadway so as to avoid railing? A. Yes.

"15. Do you find it to be an act of ordinary care and prudence for a person to drive a Ford car, such as this was, from the middle of the front seat with only one hand on the wheel and with another person occupying the front seat behind the wheel, while going over a bridge and its approaches as narrow and curved as these were? A. No.

"16. Did the occupants of the car when approaching the bridge drive by three standard signs, properly placed by the roadside, bearing the inscriptions, respectively, "winding road," "slow," and "narrow bridge?" A. Yes.

"17. Before the car struck the guard rail on said bridge was there any circumstance or warning which would require a person of ordinary prudence and using ordinary care to use the emergency brake or clutch? A. No.

"18. From and after the time said automobile struck the guard rail upon said bridge would the use of the clutch or emergency brake have prevented the automobile from falling or running off the bridge? A. No.

"19. Was the guard rail on the west side of the bridge where Ella Powers was killed a sufficient barrier to turn aside or stop an automobile from running off the bridge if it should strike said guard rail? A. No.

"20. Was the said guard rail on the west side of said bridge a good, solid and substantial guard rail upon June 20, 1931, and for several months prior thereto? A. No.

"21. Was said guard rail on the west side of said bridge defective on June 20, 1931? A. Yes.

"22. If you answer the last question 'yes,' then was the defective condition of said guard rail the proximate cause of the accident? A. Yes."

This action was tried and the jury returned its general verdict and answers to special question on June 9, 1932. Neither party filed a motion for a new trial.

On June 14, 1932, defendant filed a motion for judgment in its favor upon the special findings of the jury and the undisputed evidence, notwithstanding the general verdict, and on the same day filed a separate motion to set aside the answer to special question No. 7 on the ground that it is contrary to the undisputed evidence, and to set aside answer to special question No. 22 on the grounds

that it was a question of law for the court, and not one of fact for the jury.

On October 8, 1932, plaintiff filed a motion to strike the answers to special questions Nos. 10, 11, 12, 13, 14 and 15, on the ground that they are incompetent, irrelevant, immaterial and prejudicial, not being within the issues of the case as made by the pleadings. On the same day plaintiff filed a motion for judgment in its favor upon the general verdict and the special findings made by the jury upon the issues in the action.

On November 2, 1932, plaintiff filed its motion to strike out the answers to special questions Nos. 10, 11, 12, 13, 14 and 15, on the grounds stated in his motion of October 8, and further moved the court to wholly disregard the answers to questions Nos. 13, 14 and 15, for the reason that none of said answers is sustained by any evidence in the case.

All these motions came on to be heard before the court in June, 1933, at which time the court sustained plaintiff's motions, overruled defendant's motions, and filed in the case a written decision. Thereafter and on September 16, 1933, the court rendered judgment for plaintiff on the general verdict of the jury.

The trial court sustained plaintiff's motion filed November 2, 1932, to set aside the answers to special questions Nos. 10, 11, 12, 13, 14 and 15, for the reasons:

"The ground of negligence alleged in defendant's answer as a defense was that Ethel Marie Powers, a child under fourteen years of age, was driving the car at the time of the accident.

"There is no evidence that Ethel Marie Powers was driving at the time of the accident; and the evidence conclusively shows that she was not driving the car at the time of the accident, and the jury so finds. (Findings 7, 9.)

"Therefore, findings of fact made by the jury numbered 10 to 15, inclusive, were without the issues of the case.

"At the time of the oral argument the court asked defendant's counsel if he desired to amend his answer filed in the case and counsel stated that he did not care to amend his answer."

It is true defendant specifically pleaded in its answer that Ella Powers was guilty of negligence contributing to the accident in that she permitted and caused Ethel Powers, then less than fourteen years of age, to drive the car on the approach to and entrance upon the bridge and at the time of the accident, being fully informed of the conditions existing at the bridge, and that the driving thereover

should be competent and careful; but the answer contained also the following allegation:

". . . that on the occasion in question said automobile was unskillfully and carelessly driven, by reason of which said automobile collided with the railings of said bridge and was precipitated over the side of said bridge, killing the said Ella Powers, as aforesaid."

This allegation is broad enough to permit evidence of negligent and unskillful driving at the time of the casualty, whether the car was then being driven by Ella Powers or by her daughter Ethel. The court placed too narrow a construction upon this answer in construing it to allege negligence in one particular only. The court also inaccurately stated there was no evidence that Ethel was driving at the time of the accident. Referring to that immediate time, Mabel was asked and answered questions as follows:

"Q. Where were you sitting? A. Ethel was driving and mamma was sitting in the middle and I was sitting on the other side.

"Q. Do you know who was driving when they went on the bridge? A. Yes.

"Q. Who? A. Mom."

Of course they went onto the bridge some little distance before the point of the casualty. The exclamation of the mother at the immediate time of the casualty is hardly consistent with the thought that she was in sole control of the driving of the car. It is true that Ethel, the only other witness on this point, testified that her mother kept her hand there on the wheel and was guiding the car when it struck the railing, but her hands also were on the wheel. The most that could be said about the matter is that there was a conflict in the testimony on this point.

Counsel for appellee call attention to the fact that at the time of the oral argument on these motions the court asked defendant's counsel if he desired to amend his answer, and received a negative reply. We observe that this argument was in June, 1933, approximately a year after the case had been tried, in June, 1932. The case had been tried upon an answer which, although it alleged specifically that Ethel was driving the car, contained other allegations broad enough to charge negligence of decedent irrespective of who was driving, hence there was no occasion to amend the answer. It is clear also that the case had been tried upon that theory, otherwise special questions Nos. 10 to 15 inclusive would not have been submitted, and they appear to have been submitted without objection from anyone. The evidence pertaining to who

was driving the car at the time was all introduced by plaintiff, hence he is in no position to complain about the evidence being before the court and considered by the jury.

The trial court sustained plaintiff's motion to set aside answers to questions Nos. 13, 14 and 15, holding they were not sustained by any evidence. In support of that ruling appellee argues that these questions called for expert testimony, and that none was before the court. As we read this record, counsel are in error on both points. The questions called for the exercise of the judgment of fair-minded, intelligent men, such as are presumed to have constituted the jury in this case. More than that, witnesses called by plaintiff testified to the mechanism of the car, the method of its operation, and the difficulty of one not seated in the driver's seat behind the steering wheel to operate efficiently the levers and pedals of the car.

Turning now to the motion of defendant to set aside answers to questions 7 and 22. We observe that the evidence relating to question 7 was controverted, as above pointed out. As to number 22, the well-established rule is that where the facts are in dispute the question of proximate cause is for the jury, but where the facts have been found, or are not controverted, the question is one of law for the court. (*Whitcomb v. Atchison, T. & S. F. Rly. Co.*, 128 Kan. 749, 752, 280 Pac. 900.)

As to defendant's motion for judgment in its favor on the answers to special questions notwithstanding the general verdict, we wish, first, to observe that we see no reason why defendant was not entitled to a ruling on that motion without regard to what motions plaintiff later filed—in this case four or five months later—and without regard to what ruling the court made on such motions. But we shall not determine this point, for two reasons: (1) It has not been argued, and (2) we have already determined the rulings of the trial court on plaintiff's motions were erroneous; hence, they are no longer in the way.

We next consider the ruling on defendant's motion for judgment on the answer to special questions and the undisputed evidence, notwithstanding the general verdict. The jury found the accident was caused by the car colliding or coming in contact with the railing of the bridge (5); that the railing was not a good, solid and substantial guard rail (20); and that it was defective (21) on June 20, 1931. We shall assume these findings would sustain the judgment

against the state highway commission in this case (under R. S. 1933 Supp. 68-419) if other findings do not show contributing negligence on the part of the decedent, Ella Powers. This assumption is predicated upon the view that the duty of the state highway commission to maintain "good, solid, substantial guard rails, not less than three feet high, on each side of all bridges" built or maintained by it, is the same as that imposed upon counties and townships with respect to guard rails built or maintained by them (R. S. 68-1110), although we are cited no specific statute imposing such duty. Under the undisputed evidence the jury was justified in its answers to these questions. Perhaps the planks in these guard rails were sufficiently good, solid and substantial, but the posts were small, had been used for many years, and were rotted on the outside where they were underground. The posts, however, did not break. The chief cause of the frailty of the guard rail was the shallow distance the posts were put into the ground—only twelve to fourteen inches, as testified to by one witness, and perhaps less than that near the arch of the bridges. The result was, the guard rail pushed over when the car came in contact with it.

Answering special question number 19, the jury found the guard rail was not "a sufficient barrier to turn aside or stop an automobile from running off the bridge." Appellee argues that the duty of defendant was to maintain a guard rail sufficient in strength and stability to stop or turn a vehicle which was run against it and to prevent it from running off the bridge, citing on this point *Dent v. Jefferson County Comm'rs,* 118 Kan. 519, 235 Pac. 873, and *Grier v. Marshall County Comm'rs,* 128 Kan. 95, 276 Pac. 56. That·is making too literal a use of some of the language used in those cases. They dealt with situations where there were no guard rails, hence the court was not dealing with the question of a guard rail sufficient in strength to stop or turn any vehicle which might run against it. The statute was quoted (R. S. 68-1110) respecting the duty of the county to maintain a good, solid, substantial guard rail, and we do. not regard the opinions as imposing any greater liability than stated in the statute. In its decision the trial court stated that it .followed the rule announced in the Dent and Grier cases, *supra,* apparently meaning that the law requires the state highway commission to maintain railings sufficiently solid and substantial to prevent any motor vehicle which would come in contact with them from breaking them down or from going over the side of the bridge. In this the

court erred. That question was not an issue in either of the cases mentioned, and was not decided.

In the decision by the trial court filed in this case it is said:

"The testimony of the witness Ethel Marie Powers was to the effect that a bump in the road deflected the car to the defective guard rail."

and this is treated in the decision as "positive evidence accounting for the deflection of the car into the defective guard rail." This is an inaccurate interpretation of the testimony of Ethel Powers. She testified on direct examination:

"Q. And then what, if anything, happened at the slow sign? A. Well, my mother took ahold of the wheel and put one hand behind me and put the gas lever up, whenever I came to a slow sign I should always do that.

"Q. Then what was done? Did the car go on toward the bridge? A. Yes.

"Q. Well, then, just tell the jury—did your mother keep—just tell what happened. A. Well, we went on the bridge and she kept her hand there on the wheel and was guiding the car and then it seemed like we hit a bump there and I heard the railing break and the steering wheel just spun around.

"Q. Spun around? A. Yes.

"Q. And then what? A. And that's all till we got—we were over the bridge.

"You went over the bridge? A. Yes.

"Q. Did you hear your mamma say anything? A. She said, 'Oh, Ethel.'"

And on cross-examination:

"Q. You went around a curve just before you got on the bridge, did you not? A. Yes.

"Q. When you went around on the curve, the car went over on the left-hand side of the road, did it not? A. I don't know.

"Q. How did it come to hit the rail? A. I don't know.

"Q. You saw it hit the rail, did you? A. I don't know whether I saw it.

"Q. You don't remember of seeing it hit the rail? A. I heard the railing break.

"Q. You heard what? A. I heard the rails break.

"Q. Was that just before the car went over? A. Yes.

"Q. And the railing that you heard break was on the left-hand side of you, was it? A. Yes.

"Q. You don't know how long you had been on the left-hand side of the road? A. No.

"Q. When that happened—did you feel any swerve or any motion of the car at all? A. Well, it seemed like it hit a bump.

"Q. I mean before it went over. Do you know? Before it struck the rail? (Counsel for plaintiff): "She said that it hit a bump.

"Q. What do you mean by a bump? A. Well, just kind of jarred.

"Q. Did you see anything in the road? Any bump or anything? A. No.

"Q. You remember, however, that it hit a bump. A. Well, the car kind of jarred.

"Q. Did you tell anybody about that? A. No.

"Q. Did anybody ask you if you had hit a bump in the road? A. No.

"Q. Nobody asked you that particularly? A. No.

"Q. Well, when you hit the bump, what happened then? A. Well, the steering wheel spun around and I heard the railing break.

"Q. What part of the road was the bump in? A. I don't know.

"Q. You don't know whether it was on the left-hand side of the road or in the middle, do you? You don't remember? A. Well, I don't remember exactly where it was.

"Q. Did anything happen to suddenly make the car jump to one side or the other? A. Not that I know of.

"Q. You didn't try to help your mother to control the wheel. Nothing happened so that you tried to help to keep the car in the middle? A. No.

"Q. And you weren't frightened until the car actually hit the railing and went over, were you? A. No."

It seems clear that when the witness testified "it seemed like it hit a bump," she was simply describing her sensations at the time the car hit the railing. On being asked: "What do you mean by a bump?" she answered: "Well, it just kind of jarred." She saw no bump, or anything of that kind in the road, and the only thing which made her use that term was that the car "kind of jarred." This action was not predicated upon any defect in the roadway itself. There is no allegation in the petition that the surface of the roadway was defective in any particular. The testimony on that point was that the surface of the roadbed was smooth. It had been dragged with a scraper regularly twice a week and had been so dragged that day before the casualty. Other witnesses testified there were no ruts in the roadway, although tracks of cars could be seen on the dirt surface of the roadway. No one testified that there was any hole in the surface of the roadbed, or any stone or any other object thereon, or that there was any defect of any kind in the roadbed; no contention of that kind was made by the plaintiff in the pleadings, or at any time in the trial, and the defendant was never called upon to defend against an alleged defect in the roadbed itself. It was therefore error for the court to take the testimony of this witness, which obviously describes simply her sensations, and who testified that she knew of nothing in the roadbed to cause any bump or to cause the car to be deflected into the railing, and use this as a foundation of a judgment against defendant, who had never been called upon to defend against such a defect in the highway. The jury did not find that the automobile was precipitated into the railing by a bump in the surface of the high-

way, but, on the other hand, did find that the accident was caused by the car colliding or coming in contact with the railing (5), and that by the preponderance of the evidence, in its judgment this was caused by the lack of care in driving the car across the bridge (14).

Let us now examine these findings to see if Ella Powers was guilty of negligence which contributed to the casualty. She was familiar with this bridge and had driven over it many times prior to the accident (3). The approach and width of the bridge were such as obviously to require careful, skillful and competent driving on the part of one about to cross the bridge (4), but by the exercise of careful attention and skillful and competent driving there was nothing to prevent a car from being driven safely over the bridge on the day in question (2). The traveled portion of the roadway at the point of the casualty was twelve feet wide (6). Ethel was not driving on the approach to the bridge (7), or at the point of the casualty (9), but she remained in the driver's seat and behind the wheel until the casualty occurred (10). Ella Powers drove the car from the middle of the front seat at the right of Ethel, who was in the driver's seat, and with only one hand on the wheel (11). From where she sat she could not quickly and efficiently control the emergency brake and the clutch (12), and from where she sat, and with only one hand on the wheel, she could not drive the car over the curves and narrow bridge with as much accuracy and safety as she could have done from the driver's seat behind the wheel and with both hands on the wheel (13). The casualty was "probably caused" by the failure to drive the car accurately along the roadway so as to avoid the railing (14). It was not an act of ordinary care and prudence for her to drive the car from the middle of the front seat, with only one hand on the wheel, and with another person occupying the front seat behind the wheel, while going over the bridge and its approaches (15). Negligence, of course, is simply the lack of ordinary care. The jury found Ella Powers did not use ordinary care and prudence in driving the car on this occasion. It also found that the casualty was caused by the car colliding or coming in contact with the railing of the bridge (5), and this was "probably caused" by the failure to drive accurately along the roadway (14), which failure resulted from the lack of ordinary care and prudence (15). Some criticism is made of the word "probably" in the fourteenth special question, but as used here it simply meant that the preponderance of the evidence so indicated. The liability of

the state, through the state highway commission, to persons injured by reason of defects in the highway is statutory (R. S. 1933 Supp. 68-419; *Gorges v. State Highway Comm.*, 135 Kan. 371, 372, 10 P. 2d 834), and the statute limits such recovery to one who is "without contributing negligence on his part." While such contributing negligence is a matter of defense, it may be disclosed by the evidence of witnesses called by plaintiff, as in other negligence cases (*Arnold v. Coffey County Comm'rs*, 131 Kan. 343, 347, 348, 291 Pac. 762), and where such contributing negligence is shown by the evidence, and found by the jury, there can be no recovery. In this case it was well established, and may be conceded, that the railing of this bridge was not sufficient to measure up to the statutory requirements of a good, solid and substantial railing (R. S. 68-1110), and that the highway was defective in that respect. But the jury has found that there was a lack of due care and prudence on the part of Ella Powers, and hence negligence on her part which contributed to the casualty; and these findings are supported by evidence which may be said to be undisputed, for all the evidence relating to how the casualty occurred came from witnesses called by plaintiff—the defendant had no witnesses on that immediate point. In its written decision the court conceived it to be its duty to pass, as a matter of law, upon the question whether Ella Powers was negligent in a way which contributed to the casualty. That was not the function of the court, but was a question properly for the determination of the jury. (*Lilly v. Wichita Railroad & Light Co.*, 127 Kan. 527, 274 Pac. 205, and cases there cited.) More than that, the jury had passed upon it in its answers to special questions. Much is said in the petition and elsewhere in the record about the curve in the highway as it approached the bridge from the south. The car was driven over this curve carefully and without any untoward incident, hence the fact that the curve was there has no bearing upon the liability of defendant in this case. Its only effect is to emphasize the necessity of care and prudence in driving. But this curve ended as much as fifteen feet before the bridge was reached, and from that point on across the bridge the road was straight and was a smooth, well-graded roadway, twelve feet wide, without ruts, holes, or other obstructions. There is no reason why anyone using due care could not drive along it without running into the railing. It was pleaded in this case, and was argued, that the curved ap-

proach to the bridge threw the car over near to the left-hand railing as it went onto the bridge. There is no evidence that it did so in this case, and that is not the part of the railing the car struck. At the last turn, when the bridge was approached, the car was far enough away from the left-hand side of the road to miss all the railing there was until the center of the bridge was reached or passed, and then, through some inattention or lack of care in driving, it was driven into or permitted to come in contact with the railing.

Reverting again to special question No. 22, the rule previously has been stated that where the facts are not controverted, or have been found, the question of proximate cause is for the court. Here the facts had been found by the jury that the accident was caused by the car coming in contact with the railing of the bridge, and this resulted from the lack of care in driving the car; hence, there is but one answer to what was the proximate cause of this casualty, and that is the lack of care and prudence on the part of the driver of the car.

The result is the judgment of the trial court must be reversed with directions to enter judgment for defendant upon the answers to special questions notwithstanding the general verdict. It is so ordered.

BURCH, J., not sitting.